**91 RANCH CORPORATION, a Wyoming corporation, Plaintiff,**

v.

**ARMOUR AND COMPANY, a Delaware corporation, and Cache Valley Breeding Association, a Utah corporation, Defendants.**

**Civ. No. 5095.**

United States District Court
D. Wyoming.

Nov. 1, 1967.

Thomas S. Smith, Laramie, Wyo., for plaintiff.

Alfred M. Pence, Laramie, Wyo., for defendant Armour & Co.

Arthur Kline, Cheyenne, Wyo., for defendant Cache Valley Breeding Ass'n.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court, the Court heard the evidence submitted for and on behalf of plaintiff, and the evidence adduced for and on behalf of defendants, and took said matter under advisement; and the Court, having carefully examined the record on file herein, and being fully advised in the premises, does hereby make the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1.  Plaintiff, 91 Ranch Corporation, is a corporation duly organized and existing under the laws of the State of Wyoming, and owns and operates a ranch in Albany County, Wyoming.

2.  Defendant Armour and Company is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois, and it is duly qualified to do business in the State of Wyoming.

3.  Defendant Cache Valley Breeding Association is a corporation duly organized and existing under the laws of the State of Utah, with its principal place of business in Logan, Utah, and it is duly qualified to do business in the State of Wyoming.

4.  Plaintiff seeks to recover damages allegedly suffered from the use of the Hh–012 semen in its 1965 breeding artifi-

cial insemination program. Defendant Armour and Company seeks to recover from plaintiff the value of six (6) bull calves which plaintiff failed to deliver to Armour and Company pursuant to a Bill of Sale dated December 10, 1964, and to recover the one-fourth ($\frac{1}{4}$) interest in the bull known as C. H. Prince Donald B12 and registered as No. 9700314 pursuant to the provisions of said Bill of Sale, and for damages for plaintiff's failure to re-transfer said interest. Defendant Cache Valley Breeding Association claims an indebtedness due from plaintiff for semen sold and delivered to plaintiff.

5. On December 10, 1964, plaintiff and defendant Armour and Company entered into a written contract under the terms of which Armour and Company transferred to plaintiff a one-fourth interest in the bull C. H. Prince Donald B12, registered as No. 9700314, and agreed to deliver to plaintiff sufficient ampules of frozen semen from said bull to breed plaintiff's cows, the cost to be borne by plaintiff at regular retail prices. Under said contract plaintiff agreed to re-transfer to Armour and Company, at the latter's option, said one-fourth interest in bull C. H. Prince Donald B12, and to give Armour and Company its choice of six bull calves produced from the semen delivered.

6. Armour and Company collected, evaluated, processed and prepared for sale and re-sale ampules of frozen semen Hh–012 from bull C. H. Prince Donald B12, registered as No. 9700314. Cache Valley Breeding Association was the distributor of semen in Wyoming, for Armour and Company. With the exception of two ampules shipped from Armour and Company to Cache Valley in 1964, Cache Valley received the ampules in issue from Armour and Company in March and June 1965.

7. Plaintiff purchased from Cache Valley Breeding Association 2004 ampules of the Hh–012 semen at $3.00 per ampule. Cache Valley delivered to plaintiff 1200 of said ampules on June 28, 1965, and 300 ampules on August 15, 1965; 504 ampules were shipped by air directly to plaintiff from Armour and Company on August 22, 1965.

8. Plaintiff's summer breeding program commenced on July 2, 1965, and ended in September 1965. The first cycle began July 2, 1965, and the second and third cycles began July 23 and August 13, 1965, respectively. As of August 2, 1965, plaintiff was satisfied with the breeding with the Hh–012 semen. It reported to Armour and Company that it bred 790 registered cows and heifers out of 1000 eligible in the first cycle of 21 days, and that it was getting very few repeats. Between August 2 and September 3, 1965, the percentage of conception was not satisfactory to plaintiff, who believed that the Hh–012 semen was at fault.

9. Plaintiff has no record of which cow was bred to which freeze code of the Hh–012 semen. There is no evidence of the number of cows which conceived from the re-breeding. Plaintiff has no record of calves actually produced.

10. Sixty-five to ninety-five percent of successful breeding by artificial insemination is due to careful, skillful techniques in the use and handling of the semen. In its artificial insemination program of 1965, plaintiff did not conform to the generally accepted standards or procedures. It departed from approved techniques in the following particulars: it did not use ice water to thaw the ampules of semen; the ampules were not dried before use; the inseminator had an assistant who extracted the semen and handed him the tube; there was no trash barrel and debris was present on the ground; 181 cows were bred with half an ampule in the last five days of the first cycle and there is no record of which cows were thus bred; 60 cows were inseminated by using 25 pipettes and there is no record of which cows were thus inseminated. About July 21–23, 1965, plaintiff's inseminator started paying a bonus of fifty cents a head for every cow in heat which his helpers brought to the breeding corral. Young, inexperienced help, including a daughter of the manager of plaintiff, attempted to detect the cows in heat. Plaintiff's rec-

ords show that something less than 1311 ampules were used to inseminate 1412 cows during the 1965 breeding season.

11. Armour and Company followed standard procedure in collecting the Hh–012 semen in the Armour Beef Cattle Improvement Research bull stud, in evaluating and re-evaluating it, and in freezing and in storing it until it was shipped out of the Laboratory. The frozen semen is identified by code number.

12. As the semen is packed for shipping, samples are removed from each collection of semen and re-evaluated to make certain that the standards established by Armour are still adhered to. If, at this time, the semen falls below the standards, the entire collection of semen so involved is destroyed. Before the semen was shipped to Cache Valley and to plaintiff, it was examined and was found to meet the standards set by Armour.

13. Armour followed standard procedure for the packing of semen for shipment and sufficient nitrogen was added after the semen was transferred to the shipping container to insure that nitrogen would be present for the expected duration of the trip to maintain the appropriate temperature.

14. Cache Valley Breeding Association did not perform any additional processes, treatments, or special handling of the ampules of Hh–012 semen between the time they were received from Armour and Company and delivered to plaintiff.

15. Cache Valley stored the semen here in issue and shipped it to plaintiff according to its customary standards and methods and said methods were commercially acceptable in the trade.

16. The Hh–012 frozen semen was shipped by each defendant in unsealed containers in order to provide an outlet for gas arising from the liquid nitrogen to escape. All the frozen semen received by plaintiff was still frozen on a slant and could not have melted and then been re-frozen. There is no dispute over the adequacy of the nitrogen level at all times.

17. The evaluation of semen is a subjective process, depending upon individual experience, opinion, and knowledge of the breeding history of the bull, the skill and manner of testing and the individual grading system used. Of the 1200 ampules received by plaintiff in the June 28, 1965, shipment, the evaluation of only one freeze code, namely, "3 L 4" containing 167 ampules was graded by one expert as below his standard and that expert had no information concerning the performance record of the bull C. H. Prince Donald B12. There is no evidence of when, nor on what cows, nor how many of the "3 L 4" ampules were used by plaintiff's inseminator

18. The Hh–012 semen shipped by defendants to plaintiff was graded at least twenty-five percent alive and "3 plus motility" which grade was the minimum standard set and maintained by Armour and Company as usable, merchantable, and commercially acceptable. Each ampule contained 1 cc of fluid and 20 million normal live sperm cells as compared to the 10 million required in the general practice.

19. Historically, the conception rate of the bull Hh–012 was satisfactory. As of September 15, 1966, seventy percent out of 10,000 services for the bull Hh–012, covering several previous years' experience, were above the level of conception rate considered satisfactory in the industry.

20. Neither Cache Valley nor Armour and Company have received complaints from any breeders who have used the Hh–012 semen other than plaintiff.

21. All the Hh–012 semen purchased and received by plaintiff and shipped to plaintiff from defendants was fit for the breeding purposes for which it was intended and was of merchantable quality both at the time of its shipment by defendants and at the time it was received by plaintiff.

22. The failure of plaintiff's cows to conceive from artificial insemination during the 1965 breeding was chargeable to causes other than defective or unfit semen supplied by either Cache Valley

Breeding Association or Armour and Company.

23. There is no breach of warranty, express or implied, on the part of Armour and Company, or Cache Valley Breeding Association.

24. Both Armour and Company and Cache Valley Breeding Association did all that was required of them to supply plaintiff with bovine semen fit for the intended purpose of artificial insemination of beef cows during plaintiff's 1965 breeding season.

25. Armour and Company was not negligent in the collection, preparation, testing, and storing of the Hh–012 semen, nor in the transportation and delivery of said semen directly to plaintiff and to Cache Valley Breeding Association for the purpose of artificial insemination of plaintiff's beef cows in its 1965 breeding season.

26. Cache Valley was not negligent in the receiving, storage or handling of the Hh–012 semen nor in the transportation and delivery of said semen to plaintiff for the purpose of artificial insemination of its beef cows in the 1965 breeding season.

27. There was no negligence in the transportation, handling or delivery of the Hh–012 semen on the part of any common carrier to whom the defendants entrusted the transportation of such semen.

28. Plaintiff is indebted to Cache Valley Breeding Association in the sum of $6,955.09 for semen and other supplies furnished to plaintiff for its 1965 summer breeding program, and in the sum of $1,679.50 for semen and other supplies furnished to plaintiff for its 1965 fall breeding program, or in the total amount of $8,634.59.

29. Plaintiff failed to keep the generic records or the weaning records of the bull calves sired by the Hh–012. According to the plaintiff's records which are available the sire of the calves is questionable and their pedigree invalid. Armour and Company therefore is entitled to recover from plaintiff the reasonable value of six bull calves at $400.00 apiece, or a total of $2,400.00.

30. Plaintiff's retention of the one-fourth interest in bull C. H. Prince Donald B12 did not deprive Armour and Company of the service of said bull for breeding purposes. Armour and Company did not sustain damages for the failure of plaintiff to transfer back to Armour and Company the one-fourth interest in the bull C. H. Prince Donald B12.

## CONCLUSIONS OF LAW

1. Jurisdiction of the parties and this cause is based on diversity of citizenship and the requisite amount in controversy, both of which statutory requirements are satisfied.

2. Plaintiff failed to prove by a preponderance of the evidence that the Hh–012 semen shipped to it by defendants was of inferior quality or was unfit or unsuitable for its 1965 artificial insemination program, either at the time of shipment to plaintiff or at the time it was received by plaintiff.

3. Plaintiff did not prove by a preponderance of the evidence that it suffered a poor calf crop from its 1965 breeding season or that it sustained damages as a result of the use of the Hh–012 semen which it purchased from Cache Valley Breeding Association and which was shipped to plaintiff from Cache Valley Breeding Association and from Armour and Company.

4. Defendant Cache Valley Breeding Association is entitled to judgment against plaintiff in the sum of $8,634.59, and plaintiff should recover nothing from said defendant on plaintiff's complaint.

5. The contract dated December 10, 1964, between Armour and Company and plaintiff is a valid, subsisting contract, and defendant Armour and Company is entitled to judgment against plaintiff in the sum of $2,400.00, representing the reasonable value of six bull calves, and plaintiff should recover nothing from said defendant on plaintiff's complaint.

Judgment will be entered accordingly.